Filed 2/10/15  In re Spencer R. CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re SPENCER R., et al., Persons Coming Under the Juvenile Court Law. | B256534<br><br>(Los Angeles County Super. Ct. No. DK00124) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>MARTIN R.,<br><br>Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Debra Losnick, Commissioner.  Affirmed.

Christopher R. Booth, under appointment by the Court of Appeal, for Defendant and Appellant.

Mark J. Saladino, County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Jacklyn K. Louie, Principal Deputy County Counsel, for Plaintiff and Respondent.

_____

Martin R. (father) appeals from the order declaring his son and daughter dependents under Welfare and Institutions Code section 300, subdivision (c).[1] He contends the jurisdictional finding against him is not supported by substantial evidence. We affirm.

## PROCEDURAL BACKGROUND

On July 24, 2013, the Los Angeles County Department of Children and Family Services (the Department) filed a dependency petition alleging that Spencer R., father's eleven-year-old son, and Lauren R., his eight-year-old daughter, were minors as described in section 300, subdivisions (a), (b), and (c). The Department alleged father and mother[2] had a history of domestic violence, and father emotionally abused the children on numerous occasions, including engaging in "explosive and aggressive" behavior like screaming and yelling at them and threatening to have their mother arrested, resulting in severe emotional distress and placing the children at substantial risk of suffering serious emotional damage. Both parents appeared at the July 24, 2013 detention hearing, and the court detained the children from father and released them to mother. The court also ordered monitored visitation for father, but specified that visits were not to take place in the family home and were not to be monitored by mother.

In September 2013, father informed the court he planned to contest jurisdiction, and the court continued the hearing date from October 8, 2013, to December 11, 2013. The Department filed its jurisdiction report on October 8, 2013. On November 19, 2013, father's counsel made a "walk-on" request, stating he was not getting visits as ordered by the court. The court ordered the Department to enroll the children in individual

---

[1] All further statutory references are to the Welfare and Institutions Code, unless otherwise indicated.

[2] The court made no jurisdictional findings against mother, and she is not a party to this appeal.

counseling and begin conjoint counseling with father when the therapist considered the children ready. The court further ordered the Department to set up a visitation schedule for father and to prepare a report addressing parents' progress, father's visits, and any change in the Department's recommendation. The court later continued the jurisdiction hearing multiple times for various reasons, eventually setting a hearing date of May 14, 2014. The Department filed an addendum report, with several attachments on May 2, 2014.

The court conducted the jurisdiction and disposition hearings over two days. Before testimony began, father's counsel objected to the Department's reports and several attachments as hearsay. The court ruled the reports were admissible, but the unavailability of witnesses would affect the weight given to their statements. With respect to father's objections to the admissibility of emails or screen shots of text messages, the court would consider each item separately as the issue came up. It received into evidence the Department's October 8, 2013 and May 14, 2014 reports, including all attachments. Father's counsel also entered into evidence several police reports and previous declarations, and one order after hearing from a family law case involving mother and father. The Department did not call any witnesses. Father called mother, a Department social worker, and father's adult son, who is the children's half-sibling, as witnesses. After argument, the court struck the petition allegations under the section 300, subdivisions (a) and (b) regarding domestic violence, and found true the subdivision (c) allegations regarding father's emotional abuse of both children. It ordered the children placed with mother under the Department's supervision. It also ordered services for both mother and father and visits between father and the children would remain monitored. Father timely appealed.

## FACTUAL BACKGROUND

Mother and father were previously married to each other, but separated in 2011 and are now divorced. Mother describes father as a high-powered attorney who is

3

unrelenting, intimidating, and who usually gets his way. She claims he has barraged her with about 40,000 emails since their divorce. Both children report being scared of father, but deny any physical or sexual abuse.

In December 2011, father was arrested after swinging a hammer at mother in the house. According to mother, father walked into the house and told mother to get Lauren and her friend out of the house. He threatened to kill mother with the hammer and break every window in the house. Mother called the police when father grabbed her arm and a hammer. He swung intending to hit mother with the hammer, but mother pulled away, avoiding injury. Father left the house before police arrived, but later returned and was detained and booked on a felony charge of making criminal threats. Mother declined to press charges and the matter was dropped.

On Halloween in 2012, both mother and father were arrested after father and one of his adult sons arrived at the home uninvited and began videotaping. Mother and father scuffled with a folding chair in between them before police arrived while the children and mother's guests were in the house. After the children and guests had left to go trick-or-treating, police placed mother and father under arrest.

In 2013, police were called to intervene in situations involving father and the children on three separate occasions within two months. In early June, after father became angry at Lauren for walking in the house with muddy shoes, the children locked themselves inside father's bathroom and refused to come out. They texted mother claiming they feared for their lives, and mother called 911. Police arrived and convinced the children to exit the bathroom. The officer was uncomfortable about leaving the children with father because they appeared very afraid of him, but did so since there was no evidence of physical abuse. On June 21, 2013, the children were at father's house and father was yelling and screaming. According to Spencer, "My father wouldn't stop screaming at us . . . it's hard to describe his scream . . . he is screaming at the top of his lungs . . . it is a loud rant[.] This time he went really crazy because I asked him why he got the bigger house and my mom got the smaller house after the divorce. He screamed and screamed and screamed. My sister began crying because she was so scared." When

4

Lauren responded by saying she wanted to hurt herself, father responded by telling her to "go get a knife." After father's girlfriend removed Lauren from the situation, Spencer became afraid father might use the knife on him. Father acknowledged to the social worker that things had gotten out of control, but denied ranting and raving or yelling at the top of his voice. He admitted his girlfriend took the children out of the home because the children had gotten out of control. Father's girlfriend took the children to their aunt's house. Later that day, when father went to his sister's home requesting to have the children returned to him, the sister refused because the children were very frightened of him. Father called the police. The police spoke with the sister and the children and agreed the children should remain with the sister.

The most recent incident involving the police took place on July 21, 2013. Father had left the children in the care of a former nanny while he attended a social function. Father had fired the nanny about five months earlier. When the children refused to return to father, he and the nanny independently called the police. Father complained the nanny was refusing to release the children to him, and the nanny called for assistance because she did not want to release the children to father because they were terrified of him. According to the nanny, at one point, the children's panic had turned into a frenzy when father threatened to call the police and have mother arrested. When the officer arrived, he observed that the children "were both hysterical, shaking in fear and repeatedly told me that they were terrified of being alone with father." The children had moved a heavy dining table against the wall and barricaded themselves behind it. Father was surprised that the police refused to release the children to him. When the officer informed father that a social worker had been called to assess the children, father chose not to wait for the social worker, instead telling the officer he wanted the children placed in foster care rather than returned to the custody of their mother.

The record is unclear about the frequency of the children's visits with father after the Department filed the dependency petition in July 2013. When the Department prepared a jurisdiction report in October 2013, Lauren did not want to visit with father at all, and Spencer did not want to visit with father unless and until father made progress

with a therapist.  The Department identified father's inability to acknowledge his contribution to the children's anxiety as major barrier to improvement.  Father attributed the children's anxiety to alleged coaching by mother.  A social worker also testified that the children did not wish to see father initially, but later agreed to see him after both the social worker and mother encouraged them to do so.  Mother testified that father cancels a lot of visits and sees children for about 30 percent of the scheduled visits.  She informs father when there are opportunities to see the kids when they are out of school, but he does not take advantage of those opportunities.  Although mother feels it is important for the children to have a relationship with father, the children express extreme dissatisfaction with having to visit him, and return from visits hurt, disappointed, and angry.

Mother had enrolled the children in individual counseling for two to three months, but father refused to participate in counseling with them.  Mother discontinued the children's therapy in mid-January 2014, because she was planning to move and therapist friends advised her it would be hard for the children to transition from one therapist to another after the move.

In March 2014, father provided the Department with a letter from a therapist he had been seeing weekly since November 2013, with the sessions revolving around "identification of feelings in order to promote positive relationship, and to improve healthy and constructive communication between [father] and his children."  The therapist reported that father consistently "shared loving, and fun memories of his children and has also processed the loss and grief related to dissolution of his marriage and the gap it has created in maintaining the close relationship with his children."  In closing, the therapist "strongly suggests continuation of behavioral health services."  Father never signed a release permitting the social worker to contact the therapist.

After the court continued the jurisdiction hearing from March 2014 to May 2014, father sent mother an email stating he would not be seeing the children until after the May 2014 hearing, and closed by stating, "Give the children my best for the next 2 months."  After the social worker encouraged him to continue visitation, father did have

6

one monitored visit on April 27, 2014.  After the visit, he sent a caustic email to mother accusing her of turning the children against him because they said during the visit, "I ruined their lives because I am rich, own a mansion, have many cars and refuse to pay for their school."  By May 2014, the children were doing well in school and had no behavioral issues, but remained resistant to visits with father.

At father's April 2014 visit, father's adult son had difficulty getting Lauren to go with father, and she was yelling, "I don't want to go.  I don't want to go with him."  She eventually acquiesced after about 10 minutes, but both children were very unhappy and kept saying they did not want to do this.  Father's adult son also testified that father lacks the tools necessary to interact with Lauren when she is upset.

## DISCUSSION

Father contends substantial evidence does not support the dependency court's finding that the children were described by section 300, subdivision (c).  He argues the Department failed to provide evidence of current serious emotional damage, or a risk of such damage, sufficient to justify dependency jurisdiction.  The children's substantiated fear of father and their ongoing resistance to visits with father provides substantial evidence to support the court's jurisdictional finding, particularly when considered in light of father's past actions and ongoing hostile communications with mother.

We apply the substantial evidence standard of review when examining the sufficiency of the evidence supporting the court's jurisdictional findings.  "[W]e draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." (*In re Heather A.* (1996) 52 Cal.App.4th 183, 193.)  The pertinent inquiry is whether substantial evidence supports the finding, not whether a contrary finding might have been made.  (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 228.)  It is father's burden on appeal to show that there is no evidence of a sufficiently substantial character

7

to support the court's order.  (*In re Geoffrey G.* (1979) 98 Cal.App.3d 412, 420.)  In addition, during our review of the lower court's ruling, we must give prime focus on the children's best interests and consider the goal of assuring stability and continuity.  (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317.)

Three elements must be satisfied for a child to fall within the scope of section 300, subdivision (c): [3]  "(1) serious emotional damage as evidenced by severe anxiety, depression, withdrawal or untoward aggressive behavior or a substantial risk of severe emotional harm if jurisdiction is not assumed; (2) offending parental conduct; and (3) causation."  (*In re Brison C.* (2000) 81 Cal.App.4th 1373, 1379 (*Brison*).)

Father concedes there was sufficient evidence of offending parental conduct.  With respect to causation, he contends that the children's reaction had more to do with coaching by mother than with his behavior.  However, there is sufficient evidence to support the trial court's conclusion that the children's fear and aversion to spending time with father was caused by father's conduct.  Father's inability to interact appropriately with his children during emotionally difficult times puts them at risk of severe emotional harm.  He admits that in June 2013, things got "out of control" and his girlfriend had to remove the children from the home.  Father acknowledges calling the police that same day when the children refused to go with father because they were afraid of him.  He did this even when his own sister was the one refusing to release the children to him.  His adult son testified father lacks the ability to handle Lauren's emotional outbursts.  For example, "when she gets very, very upset, he kind of just doesn't know what to do. . . . [H]e's said to me 'I don't know what to do.  I don't know how to calm her down.'  That's pretty much his baseline reaction for a lot of things."  Evidence such as this supports a finding of causation.

---

[3] Section 300, subdivision (c) provides in pertinent part:  "The child is suffering serious emotional damage, or is at substantial risk of suffering serious emotional damage, evidenced by severe anxiety, depression, withdrawal, or untoward aggressive behavior toward self or others, as a result of the conduct of the parent . . . ."

Father's main argument is that more than a year has passed since the triggering incidents, and the evidence of the children's emotional distress did not rise to the level of severity required under California case law. In *Brison, supra,* 81 Cal.App.4th at pages 1379-1380, the court reversed a lower court jurisdictional finding, concluding that when a child was physically healthy, performing well in school, did not exhibit behavioral difficulties, interacted well with the other parent, and where no psychological testimony or written evaluation of child's current mental condition was presented, there was insufficient evidence to support a jurisdictional finding under subdivision (c). Father relies on *Brison* to argue that because the children were doing well in school, had no behavioral issues, had not been in therapy for months, and there was no testimony from a psychologist regarding any risk of emotional damage, there was insufficient evidence for the court to exercise jurisdiction under subdivision (c) of section 300. His argument ignores important factual distinctions between the two cases. In *Brison*, the minor was described as a "remarkably resilient child," and by the time of the jurisdictional hearing, both parents had "recognized the inappropriateness of their past behavior and of commenting to Brison about the other." (*Id*. at pp. 1380-1381.) In addition, the court in *Brison* noted the absence of any evidence that the parents were "incapable of expressing their frustration with each other in an appropriate manner." (*Id.* at p. 1381.) In contrast, the parents in our case continue to behave badly. The Department's most recent report included several emails supporting its characterization of communications between the parents as "uncivil and demeaning." Based on the emails the report concludes, "it appears that both parents are exposing the children to their personal and marital issues without reservations." An email from father to mother just weeks before the jurisdiction hearing evidenced father's fury, sarcasm, and ongoing animosity towards mother, over the fact that the children questioned the division of assets in connection with the parents' divorce. Given the children's emotional fragility, their expressed anxiety and antipathy to visits with father, and the ongoing hostility between the parents, we cannot say the court's jurisdictional finding is not supported by substantial evidence.

## DISPOSITION

The court's order sustaining petition allegations under section 300, subdivision (c) is affirmed.

KRIEGLER, J.

We concur:

MOSK, Acting P. J.

GOODMAN, J. *

---

* Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.